NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

## ANTIMO RUSSO, PETITIONER, v. WRIGHT AERONAUTICAL CORPORATION, RESPONDENT.

Decided January 17, 1947.

For the petitioner, *Fox & Krieger* (*Nathan Rabinowitz,* of counsel).

For the respondent, *John W. Taylor.*

This is a proceeding brought by the petitioner, Antimo Russo, against Wright Aeronautical Corporation, respondent, seeking compensation under and by virtue of the provisions of *R. S.* 34:15–1, *et seq.; N. J. S. A.* 34:15–1, *et seq.,* "prescribing the liability of an employer to make compensation for injuries received in the course of employment, establishing

an elective schedule of compensation and regulating procedure for the determination of liability and compensation thereunder," together with the several acts amendatory thereof and supplemental thereto.

A petition and an answer thereto were duly filed with the secretary of the Workmen's Compensation Bureau at his office in Trenton, New Jersey. In regular course the cause came on for trial before me, John J. Stahl, a deputy Commissioner of Compensation, at the Bureau Chambers, 158 Ellison Street, Paterson, New Jersey.

The present proceeding is grounded upon a claim involving a seminoma or cancer of the petitioner's right testicle. The vital issue in controversy is confined to the question as to whether the course of the cancer was influenced, hastened or aggravated by an accident arising out of and in the course of the petitioner's employment with the respondent.

The burden of proof rests upon the petitioner to establish his right to an award of compensation from the respondent by a fair preponderance of the evidence.

The facts as developed by the evidence reveal that the petitioner, Antimo Russo, was regularly employed by the respondent at its plant in Paterson, New Jersey, as an engine packer, receiving wages at the rate of $37.18 per week. Prior to such employment he was examined by one of respondent's physicians, and his health and physical condition were found good. On the day of the accident, on or about April 28th, 1943, while petitioner and four co-workers were pushing a crated motor on a dolly (a small wheeled truck) up an incline to a loading platform, the surface of which was uneven, the dolly struck a bump in the floor, whereupon petitioner's co-workers let go, leaving petitioner with the entire weight, and although the box did not strike him, the sudden jolt and vibration of the same forced him backwards and his legs crossed, followed by a sharp pain in the right testicle and lower spine. He nearly fell to the floor, but instead landed in a crouched position, balancing himself with his outstretched hand, which prevented him from falling on his back. He arose and then sat and rested on a box nearby for about ten minutes. He refrained from heavy work for the rest of that

day and went home at 11:00 o'clock in the evening, his usual quitting time. The next day he returned to work with pain in the right testicle and back, but did no heavy work. He observed that the right testicle appeared as though it were swollen. The following day he reported the accident to his employer at the respondent's plant hospital, at which time the plant physician advised him to remain at home for five days and to apply an ice bag to the scrotal area, which he did for that period. At the expiration of the five days, another physician in respondent's employ examined him, who advised that he wear a supporter or strap. The pain became worse but petitioner nevertheless continued to work on and off until May 27th, 1943. The pain and swelling of the right testicle became worse. He consulted Dr. Theodore Bender on June 25th, 1943, who, on July 16th, 1943, operated upon him and removed his right testicle. He remained in the hospital subsequent to the operation for fourteen days, receiving post-operative treatment and deep X-ray therapy. In January, 1944, petitioner entered the employ of the May Novelty Company as a clothing operator, doing very light work, but because of transportation difficulties to and from work, petitioner quit his job. He then undertook employment with the London Vest Company, but had to cease work on account of his condition and gradual decline in health since the accident, with a loss of weight from 205 to 175 pounds. On cross-examination, petitioner reiterated that he was pushing the box on a dolly when the dolly became stuck in a hole or crevice in the floor, which caused the box to swing around so that he had all the weight on it and this forced him back, giving him a jerk backwards. He stumbled backwards, lost his balance, and was barely able to avoid falling flat on the floor by supporting his body on his outstretched hand. He identified a statement taken from him by one Pauline Howarth, a representative of respondent's insurance carrier, containing his signature, marked R-1 for identification, dated May 26th, 1943. Another statement signed by him in the presence of one DeCotis, another representative of the carrier, dated September 9th, 1943, was shown him, marked R-a for identification.

Dr. Theodore Bender, a distinguished surgeon, had petitioner under his care at the Barnert Hospital in Paterson from July 15th to July 31st, 1943. He testified that he first examined petitioner on June 25th, 1943. At this examination he found the right side of his scrotum was about two and one-half times the normal size. There was marked oedema of the entire scrotal wall. The testicle itself presented an irregular type of enlargement on the right side. The cord coming from this testicle was thickened and there was an impulse that came through the external ring through coughing, which was not very great. There was some evidence of swelling in the inguinal region which was not marked. Dr. Bender made a tentative diagnosis of tumor of the right testicle with a possibility of a potential direct hernia, and recommended hospitalization. Petitioner was admitted to the Barnert Hospital on July 15th, 1943, and on July 16th, Dr. Bender performed an operation upon him which revealed that he had a tumor of his testicle. At the operation the entire right testicle was removed with a section of the scrotum and other parts. The entire testicular cord was dissected upward and the lymph glands along the external iliac artery were removed. The doctor's diagnosis was seminoma, that is, an embryonal adenocarcinoma. In answer to a hypothetical question embracing the essential facts as developed by the testimony, Dr. Bender said that the condition from which petitioner suffered prior to the accident could have been aggravated by the accident, and that any tumor can be aggravated by injury. In explanation he said that the injury would cause an oedema and swelling, necessarily increasing the vascularity at that area in the amount of total blood volume reaching that area in a given time so that the feeding supply to any new growth at that particular time would be increased. He also said that an injury to a pre-existing cancer could induce a displacement of cancerous cells, either into the lymphatic channels or into the blood vessels into and through the capillaries and disseminate such a tumor along that lymphatic course or along that vascular course and force it inward into some of the venules which would carry them up straight and into the right side of the heart and out into the lungs. **On**

cross-examination, Dr. Bender said that in his opinion there were tumor cells existent in petitioner prior to the accident. These are often simply cell nests, but reiterated that the accident may have or could have contributed to the growth of these cells, and the rapidity of the growth and the dissemination of the growth and that the accident could have aggravated or contributed to an increase in the growth. His attention was called to a notation made on the hospital operative record contained in *Exhibit P-1* in evidence, to the effect that there was no presence of recent or past injury, but stated that such evidence of injury could very well have passed during the five weeks of intervening treatment under ice caps to which petitioner had been subject prior to the date of his examination. The fact is that Dr. Bender first examined petitioner on June 25th, which was more than seven weeks after the date of injury.

Dr. Gay Kim, a pathologist at St. Joseph's Hospital, Paterson, testified that he had considerable experience with tumors and that a seminoma with which petitioner was suffering is a tumor. In answer to the hypothetical question, he stated that indirect trauma would cause the barrier which encased the seminoma to be broken down and such trauma is sufficient to cause spread of the cancer. This could result, he said, from a torsion or twisting of the testicular cord and a squeezing of the testes on the crossing of the legs. He explained that the twisting of the cord causes shutting off of the blood supply which, in turn, causes destruction of tissue. When the organ has been damaged there follows such destruction of tissue, which breaks down the barrier holding the cancer or tumor and allows the cancer to spread. In this sense the cancer became aggravated. Normally a testicle is encased in a capsule containing several layers of tough tissue and if this barrier is broken down, a cancer already existant will spread to other parts of the body.

Dr. A. Hobson Davis, a specialist in pathology at the Paterson General Hospital, testified that in his opinion the accident suffered by petitioner caused an injury to the testicle and this injury hastened the growth of the tumor. A trauma may hasten the growth of cancer and by metastasis spread to

other parts of the body by the cancer cells being thrown into the lumen of the blood stream. Upon the basis of a hypothetical question, he stated that in all probability the accident suffered by petitioner hastened the growth of the cancer with the resulting metastasis. On cross-examination he stated that the trauma aggravating a tumor of the testicle need not be by direct blow to the testicle, and that a torsion or twisting of the cord or testis would be sufficient, such as crossing the legs, which would cause force or pressure to the cord of the testis containing the tumor. He further testified that trauma to the testicle would ordinarily cause a swelling within twenty-four hours.

Dr. Samuel Kleiner, a specialist in internal medicine, examined petitioner on May 9th, 1946. At that time he found a generalized widely spread carcinoma causing petitioner 100% total permanent disability. He stated that the petitioner, upon the basis of the hypothetical question, had suffered a torsion of the testis in crossing his legs, which caused exudation of fluid from the testis into the scrotal sac, lighting up a quiescent tumor in the sac. He testified that the etiology or cause of this type of tumor is unknown.

On behalf of the respondent, there was produced Dr. Dominick Marini, petitioner's family physician, who testified that he examined petitioner on April 30th, 1943. He received a history from petitioner that he had pushed a box two days before that date and felt severe pain in the right testicle. Examination by him revealed a swollen and painful right testicle. There was no history given of a direct blow, he said, and he did not recall whether petitioner reported crossing his legs at the time of the accident.

Respondent also produced Dr. Philip Simon, general surgeon, who testified that he was consulted by petitioner on May 20th, 1943. He obtained a history from him that he was pushing a heavy box when he injured his testicle. On examination he found the right testicle enlarged and sore.

Dr. William J. Hoffman appeared for respondent. He testified that he was a specialist in cancer diagnosis and treatment. He examined petitioner on July 26th, 1943, at the Barnert Hospital in Paterson in the presence of Dr. Bender.

He obtained a history that on an evening in April, 1943, petitioner and three other men were pushing a dolly loaded with a case. The dolly swung around and struck his body and he felt a sharp pain in the right side of his back and left testicle. The next night the pain was quite severe over the crest of the right ilium and the right testicle felt hard and enlarged, and was about twice its normal size. He was advised at the plant to apply ice packs to the testicle and wear a suspensory and rest. After working three weeks, petitioner had to quit on account of the pain in the testicle. He returned again but then had to discontinue. Petitioner then consulted Dr. Philip Simon, who made a diagnosis of hernia and who referred him to Dr. Barlow, respondent's physician, who suggested that petitioner be admitted to the hospital for incision and drainage, which petitioner declined. Later petitioner consulted Dr. Bender. Petitioner, he said, gave no history of injury to the testicle and no history of a twisting injury. On the date of his examination he found that the right testicle and cord had been removed. He found no evidence of the metastasis or spread of the disease. He examined the specimens of his tissues which showed a typical malignant tumor of the testicle known as a seminoma, with areas of necrosis. It was his opinion that petitioner suffered from cancer of the right testicle, which was neither caused nor aggravated by the episode or mishap. He stated that an aggravation of cancer of the testicle could be expected from a severe blow or trauma, but such aggravation did not take place in this case in his opinion, for a seminoma to produce a testicle two and one-half times the normal size requires considerable time, probably a year or at least six months. He conceded, however, that under certain circumstances, a seminoma may be aggravated by trauma, but such trauma would have to be of a crushing nature to the tissues. He did not consider a tear of the testicle like torsion sufficient to aggravate a pre-existing seminoma or that any indirect trauma would be sufficient to cause an aggravation or displacement of cancerous cells.

Before the completion of the hearing in this matter, petitioner died on May 16th, 1946. Petitioner's widow, Sue

Russo, was subsequently called. She was married to the petitioner more than nine years and had one child. She testified that on the night of the accident when petitioner returned home, she found that his right testicle appeared swollen, painful and red. She applied a preparation known as "Benguay." The next day her husband went to work and returned home at 11:00 P. M., and upon inspection she found the testicle was then more swollen and painful, and she applied ice packs to it fifteen minutes a day for six days. Several days later she accompanied her husband to Dr. Marini, and at his suggestion, petitioner took hot baths for a week or so in order to reduce the swelling. He was confined to his bed most of the time when home, and had to be sustained on walking. Subsequently, he consulted Dr. Bender. Prior to the date of the accident, from her observation, petitioner was in good health, and from a physical standpoint, she found nothing wrong with him; that before the accident their sexual relations were normal, but after the accident there were no sexual relations because of his painful and swollen right testicle. She further testified that medical, surgical and hospital expenses were incurred in the amount of $1,992. She identified the several bills covering the same all of which were paid in full by petitioner. On cross-examination she stated that she was present at the time when a Miss Hayworth, a representative of the Liberty Mutual Insurance Company called, and took a written statement from petitioner, and another statement taken from petitioner by Mr. DeCotis, also a representative of the insurance company.

There were introduced into evidence by respondent *Exhibits R-2* and *R-3, Exhibit R-2* being a statement signed by petitioner, dated May 26th, 1943, and *Exhibit R-3,* being a statement signed by petitioner, dated September 9th, 1943. *Exhibit R-3* sets forth that on or about May 3d, 1943, five men, including petitioner, were pushing a box containing an engine, the box having been placed on a dolly, and four of the five men who were in charge of it were in the rear of the box, pushing it, while one man stayed in front in order to guide it. It was intended to push the engine on to a loading platform from which place it was to be loaded on an auto truck. The

statement continues as follows: "The dolly must have caught on an uneven spot of the wooden floor, for the box twisted at an angle of about 45 degrees. Inasmuch as I was pushing the box with my two hands on the box and either my right or left shoulder, the twisting which was at my end, caused me to step backward on my heels, causing my knees to bend, and in order to regain my balance and prevent myself from falling, I placed my hands downward reaching to the floor with the palms downward. I did not fall to the floor except that I was in a crouched position, with knees bent, and legs in walking stance and not crossed. At the time the box twisted I was compelled to move backward. I was not struck in any way by the twisting box. The only part of my body that touched the box that was being pushed was my two hands and my shoulders. At no time either while pushing or at the time the box was twisted did I receive a direct blow from the box to my chest, stomach, back, groins, legs or any other part of my body. At no time did my body touch the box except for my hands and shoulder. At the time I stepped backward I felt pain in my right groin and the center lower back, about a point that I would designate as the end of my spine. As soon as I straightened out of the crouched position, I walked around a bit and the pain disappeared. The remainder of the evening I continued working with no pain in any part of my body. I continued working the next day with no apparent ill effects, however that evening when I came home I began feeling pain again in my groin and back. I asked my wife to give me a rub down with 'benguay' and as I prepared myself for bed by undressing, I noticed for the first time that I had an enlarged right testicle. This was the first time I had noticed anything unusual in the region of my scrotum and testicles. I had had no previous pain in either my scrotum or testicles. The only pain I had suffered with was confined in the upper region of my right groin and center lower back, I had no other pain in any other region. * * * On May 5th, 1943, I awoke and noticed that my testicle had enlarged in size overnight, and that I was beginning to have pain in my scrotum and right testicle. That morning I reported to plant 2 hospital and advised one of

the company nurses that I sustained an injury several days previous."

By a clear preponderance of the evidence in this case, it would appear that Russo, prior to the accident and unbeknownst to himself, was a cancer victim, suffering from a seminoma, a type of testicular malignancy; that the injury sustained by him in the accident on April 28th, 1943, consisted of an indirect trauma to his right testicle, when his legs crossed as he was jerked forcibly backwards by the loaded dolly; that symptoms and signs of injury manifested themselves promptly thereafter, to wit: soreness and swelling of the right testicle to such a degree as to require medical attention and cessation of work within a few days following the said accident; and that the pre-existing cancer of the right testicle was thereby accelerated and aggravated, necessitating its removal by surgical intervention on July 16th, 1943, together with metastasis and dissemination to other parts of the body, resulting ultimately in permanent and total disability.

To warrant a recovery under the Workmen's Compensation Act it is not necessary that the injury resulting from the compensable accident be the primary cause in initiating the disability. The essential requirements of the statute are fully satisfied if, from the evidence it appears that the accidental injury, acting as an exciting cause, lights up a pre-existing disease, and thereby contributes to the disability or death. *Voorhees* v. *Smith Schoonmaker Co.,* 86 *N. J. L.* 500; 92 *Atl. Rep.* 280; *Winter* v. *Atkinson Frizelle,* 88 *N. J. L.* 401; 96 *Atl. Rep.* 360; *Lundy* v. *Brown & Co.,* 93 *N. J. L.* 469; 108 *Atl. Rep.* 252, and *Geizel* v. *Regina Co.,* 96 *N. J. L.* 31; 114 *Atl. Rep.* 328.

While the etiology of cancer is still obscure, like most any other disease it may be aggravated by trauma. Recoveries under the statute have been made in this state as well as in many other jurisdictions for disability or death due to cancer aggravated by an accidental injury. *Voorhees* v. *Schoonmaker Co., supra; Griffith Piano Co.* v. *Court of Common Pleas (Supreme Court),* 134 *Atl. Rep.* 922; *Zehrer* v. *Robertson,* 17 *N. J. Mis. R.* 53; 4 *Atl. Rep.* (2d) 854, and *Bollinger*

v. *Wagaraw Building Supply Co.*, 122 *N. J. L.* 512; 6 *Atl. Rep. (2d)* 396.

There was a sharp conflict in the medical testimony on the vital question as to whether the accident in fact aggravated the pre-existing seminoma of the petitioner's right testicle. However, in light of the symptomatology, the surgical intervention for removal of the right testicle, and the petitioner's gradual decline in health following the accident, it would seem that the greater weight of the medical testimony preponderates in favor of the petitioner's medical experts to the effect that there was such aggravation.

During the pendency of the present proceeding the petitioner died, to wit: on May 16th, 1946. In view of this circumstance, an award of compensation would be proper in favor of the petitioner up to the date of death, including the fixing of permanent disability. *Bollinger* v. *Wagaraw Building Supply Co., supra.* The precise situation arose in the case of *George T. Newell, Jr., Inc.,* v. *Workmen's Compensation Bureau,* 10 *N. J. Mis. R.* 405; 159 *Atl. Rep.* 316, wherein the New Jersey Supreme Court dealt as follows: "The next point is that there was no proper party petitioner at the time of the award, because petitioner had meantime died. We are of the opinion that, under the statute, it was proper to proceed under the petition filed to make suitable award to the date of petitioner's death."

The burden of proof which rests upon the petitioner to establish a right to compensation has been met.

\*      \*      \*      \*      \*      \*      \*

It is, therefore, \* \* \* adjudged, determined and ordered, that judgment be entered in favor of the petitioner and against the respondent.

\*      \*      \*      \*      \*      \*      \*

JOHN J. STAHL,
*Deputy Commissioner.*